Yes, Your Honor. Mr. LeBlanc. Yes, Your Honor. Andrew LeBlanc of Milbank on behalf of the Ad Hoc Committee of Non-Consenting Creditors. You may proceed when you are ready. Thank you, Your Honor. May it please the Court. Your Honors, this case implicates one of the most fundamental principles of the Bankruptcy Code, and that is the requirement for the equality of treatment of claims under a plan of reorganization. It's a steadfast requirement that claims be treated equally under a plan of reorganization, and the plan that was approved here and affirmed by the District Court unquestionably does not treat claims similarly. And just to be clear about what we're complaining about here, we're not complaining about every aspect of the reorganization, but instead one specific element of the reorganization plan, and that is what was called the private placement. The private placement was a sale of almost half of the debtor's equity to a select group of creditors at an enormous discount to the value of that equity. Those facts are undisputed. In fact, the discount was written in as a 35% discount to the plan value that was negotiated and agreed amongst those parties, and that was agreed to be what ended up being at the very low end of the debtor's full range of values for their own enterprise. And so what's clear is there's enormous value, and that's undisputed. Every court that's looked at this has agreed that there was enormous value in the private placement. Where they've disagreed is on the question of whether or not that value can be distributed to creditors on an inequitable basis, and that's where we think every court that's looked at this thus far has gotten this wrong. And I can't understate the value inherent in that private placement, the value that was retained by those small subset of creditors who negotiated the plan. They're called in the papers below the consenting note holders. The value retained by them is worth $160 million, beyond that which was retained by all other creditors in the case. And that plainly violates section 1123A4 of the Bankruptcy Code made applicable to the plan of reorganization under 1129A1. Well, the debtors and committee are going to come back and say, yes, but we put in new value. We backstopped the plan. We basically guaranteed its confirmation. You could have stepped up. You could have done the same thing, and you refused to do so. What's your response? Well, Your Honor, with the last clause, I have three answers to it. I would have had two before, but with that last clause, starting with just the last point, we did offer to do exactly that. We offered to do the full capital raise with no fees and make it available to everybody through a rights offering. And why didn't that secure creditors committee want that? I mean, as I understand it, you proposed several plans as alternatives, and everybody who took a look at it, and it wasn't just one group of creditors. From top to bottom, they said this plan was better. Your Honor, that is true that we proposed multiple plans. The issue here was, and the issue here is, this type of plan, this type of private placement hadn't been ‑‑ there's been no effort to do this before. And so it was really a sui generis proposal to have this measure of equity. And what was important and what was necessary to the plan proponents in doing this was that they afforded enough, they gave enough opportunity to other people to participate, to buy their consent. Your Honors will recall the plan was proposed on the 22nd, overnight on the 22nd of December. People had seven days over the Christmas weekend to decide whether to participate. And the penalty for not deciding to participate, as our clients did, which preserved the opportunity to object to the plan, was punitive. If you look at the difference in value, that's where you get the loss of $160 million of value is if people chose not to participate. So that's why so many people participated in it. Their effort to purchase consent was effective. But that doesn't solve the problem. The court can't confirm a plan, and the court shouldn't have confirmed, and this court can't affirm a plan simply because it garnered the requisite votes. We cite the Young v. Higbee case from the Supreme Court that talks about that question. The district court's decision in Adelphia deals with that issue. You can't pay somebody differently because of how they voted and, in this case, when they voted on a plan. And that's really what the issue is, is that they couldn't, and the debtors argued below, to be very clear about the determination or the decision to make their capital available, the debtors argued below that they should be, that these proponents should be compensated for making their capital available, and they were. They were compensated handsomely for doing so. They were paid 8% commitment fees, a 2.5% ticking fee, and a breakup fee that was also equal to 8% if the debtors went in a different direction. Those were enormous fees, and I would command the court to look at section, I'm sorry, in the joint appendix, page 1791, is the order by the bankruptcy court approving the backstop commitment agreement, which approved those very large commitment fees, and the court recognized that they were large relative to all the comps that were provided, but the court concluded it was necessary, and that's not any part of our appeal before this court. So these creditors were compensated for putting their balance sheets at risk. What was never presented to the court, and therefore what the bankruptcy court never found, was that this additional value that came from the overallocation to them was also compensation for them putting their balance sheets at risk, and with good reason. The reason they didn't argue that to the bankruptcy court is because it runs squarely into the LaSalle decision. LaSalle is known as the new value case, and the Supreme Court rejected the new value concept in LaSalle as it related to equity holders. The analysis in LaSalle is indistinguishable from the analysis this court should do with respect to determining whether the compensation provided, in this case the overallocation and the private placement, whether that is reasonable compensation for putting the money up, or if instead it in fact is compensation given to them as creditors in which they're not sharing equally. And to that regard, I think your honors can look at the Pacific drilling case, which we filed in a Rule 28J letter on September 28th of last year, which was not available to the bankruptcy court because no effort had been attempted to do a similar type of private placement. And in that case, Southern District of New York bankruptcy judge Judge Wiles looked at a private placement that is indistinguishable from this one and rejected it out of hand. And the analysis that he goes through is the same analysis we would submit the court should go through here. And I'll just read the beginning passage when he first even hears of it. This is on page 26 of a 116-page transcript. So before the parties had even argued about it, Judge Wiles says, here's my problem. On the private placement and the rights offering, either the private placement is in consideration of current holdings and the agreement to equitize them, in which case you've got an equal treatment problem that's deadly to your plan, and I mean deadly. And then he says, or alternatively, skipping a sentence ahead, he says if it's not that, then it's a separate, stand-alone, reasonable financing term, right? But then he goes through the analysis to say it can't be a reasonable financing term, what they now argue it is, if you expressly exclude other people from participating in it. It's not offered on market terms, or as the Supreme Court cautioned in LaSalle, for top dollar, if you exclude other people from participating in that equity right or the financing opportunity. And that's what Judge Wiles looked at and said, and your Honor should go through that. That transcript is really a longer version of anything I would argue here, because Judge Wiles himself looks at this repeatedly and says, you simply can't do this under 1123-A-4. Let me ask you this. Was there any way under the proposal that you could have opted in to the private placement, opted in to the backstop, which was part of it, but still reserve your right to object to the plan? No, Your Honor. None whatsoever. So is the argument being that they bought acceptances? Well, they clearly bought acceptances, yes. And the primary argument is they paid people different amounts based upon whether they voted in favor of the plan and when they voted in favor of the plan. So if somebody like my client said, we think this is discriminatory, we want the ability to object, we just want to have our voices heard, they said, then you get less than everybody else. And, Your Honor, we outline in joint appendix page 1937 is the declaration of our expert presented at the confirmation hearing, and we outlined there each and every economic component of the value lost from not participating. And in our view, in our instance, from choosing to exercise our right to object to a discriminatory plan, we were forced to give up enormous value. And that simply violates the Bankruptcy Code. And the Supreme Court has been clear, even recently in the Jevick decision, that there is no rare case exception to the Bankruptcy Code. Compliance with the Bankruptcy Code is required, even if, as the debtors suggested below and they've suggested here, this was the only way that we could get this done. Counsel, what about the unknown market risk that they were bearing in addition to the other factors that you've discussed? Your Honor, they were compensated for the unknown market risk with an 8% commitment fee and a 2.5% ticking fee. And it was presented even by the debtor's own witness, Mr. Cowan from Lazard, presented that at the very high end of the range. In fact, if my recollection serves me, it was beyond the range of the similar compensation for backstop agreements in other cases. And Judge Shermer said, I'll approve it. And this is, Your Honor, why I referred the Court to page 1791 of the Joint Appendix. That's his order approving the commitment fees. He said, I'll approve it even though it's at the high end of the range. And so that is the compensation that was provided for the decision to provide that capital. Well, what's a ticking fee? Ticking fee is if their commitment remained outstanding for longer than was expected. So there was a date by which the debtors had to go effective. If it went every month that they didn't go effective, so they didn't actually fund, they got an additional 2.5% payment for the backstop. The 8% and 2.5% of what? Of the backstop commitment, which was in the aggregate $1.5 billion. So they got a total 10.5% of $1.5 billion? No, Your Honor. They got 8% up front for the commitment. Of 8% of what? Of $1.5 billion. Which is what? $120 million, I believe is the number. So they got $140 million in cash? $120 million. And I believe, Your Honor, it was paid in equity. That's not part of our appeal. But either way, they got a massive commitment fee. And then on top of that, to the extent, and I don't think their commitment stayed outstanding longer than it was expected, but if it had, so if they had to keep their balance sheets exposed for longer to compensate for the risk, as Judge Grassak asked, they would get an additional 2.5% for every month outstanding beyond that. And so they got enormous compensation. And then on top of that, they had a breakup fee, so that if the debtors did go with a different alternative for their financing, they would have gotten an additional $120 million, on top of what they would have already received, for backstopping this commitment. Counsel, as I read the district court order here, as I interpret it, it's saying in its discussion on this mootness issue that there comes a point where, just as an equitable matter, it's just too late because it would require, as the district court said, the unraveling of complex transactions undertaken after the plan was consummated. And then it linked that with the failure to appeal the denial of a stay. Aren't those pretty significant and weighty arguments at this point in the history of the case? Your Honor, they would be if we were seeking the remedy from the court that the district court suggested. We're not. We're seeking a remedy of permitting us to invest on the same terms that the most favored of the creditors below did, or alternatively an award of money damages. We're not asking for an unraveling of the plan. There would have to be no reworking of the plan whatsoever. And the reason for that is 1123A4 has an exception. You either treat everybody equally or they have to consent to lesser treatment. And every other creditor consented to that lesser treatment. We did not. So this court can remedy the unequal treatment by affording us the same treatment, and that's the reason it's not equitably moot. And I would urge the court to look at the Second Circuit decision in Ahuja v. Light Squared, Third Circuit's decision in Semkrude, the Fifth Circuit's decision in Pacific Lumber, all of which recognize the very limited nature of that equitable mootness doctrine. I see that I'm into my rebuttal time. Well, I've got one last question, and I'll give you a little more time for rebuttal. Thank you. But just as a practical matter, why didn't the ad hoc committee participate in these negotiations from the very beginning? Your Honor, there was never a suggestion, and I think it's an important question. There was never a suggestion that anybody had to participate in the mediation to receive equal treatment. That was never the concept. And, in fact, I think it's a very important issue. And I urge this, I argue this to Judge Shermer, that it would be a terrible rule of law for this court to say that to get equal treatment under 1123A4, you have to participate in the mediation in full. And the reason that would be a terrible rule of law is mediations would cease being negotiations between significant parties, where the treatment's then made available to everybody else. And, instead, everybody would have to then come and participate in the mediation for fear of losing out on the benefits that come from settling a class-wide dispute. These were disputes between the second lien lenders on the one hand and unsecured note holders on the other hand, not between the negotiating parties. And so the participation in the mediation, Your Honor, I can submit as a red herring and not a rule of law that this court would want to endorse. And, in fact, Judge Wiles, in his Pacific drilling decision, actually talks to that very issue and says, he said, I think the point of bankruptcy is the big creditors get together and they negotiate something, and it's made available to everybody. They don't take the lion's share of the spoils for themselves to settle a class-wide dispute. That's not how it works. So, Your Honor, I would appreciate some limited time on rebuttal. I appreciate Your Honor's attention to the issue, and I'll respond to my colleague's arguments. Thank you. All right. Mr. Dvoretsky. Good morning, Your Honors. May it please the Court, I'm Shai Dvoretsky with Jones Day on behalf of Peabody. The plan at issue here represented the most successful coal company reorganization in history. It allowed Peabody to make substantial payments on its preexisting debts to unsecured creditors and to emerge from bankruptcy with $1.5 billion in new equity investments, as well as nearly $2 billion in exit debt financing. The terms of the plan that the ad hoc committee challenges achieved all of this in a necessarily limited window of time because coal prices were highly volatile, which made any successful emergence from bankruptcy that much more difficult to negotiate. Well, let me tell you what my fundamental problem with this plan is, and I'll ask you to address it. And we've already talked about it with your opposing counsel. As I understand it, if somebody agreed within this very limited period of time, originally it was three days and became seven days, to sign a binding agreement to vote for the plan, they got X. If they refused to vote for the plan, they got a percentage of X. Why is that not bad faith? If you're paying somebody more money because they support the plan than somebody who doesn't support the plan. Because as the bankruptcy court found, the money being paid or the benefit being given was not for supporting the plan and it was not for a claim it was for. Instead, the commitments that were being made to purchase equity at a set price in the future, no matter what happened to coal prices in the meantime, and coal prices were highly volatile at that point. Well, your opponent said they couldn't do that. Could they have backstopped the plan, bought the equity, and still oppose it? No. So then you're buying acceptance. But you're not buying acceptance. What you're buying, in a sense, is a way to enforce the commitments to purchase the equity at the predetermined price and the backstop. If you didn't have the plan support agreement at the back end, then those front end commitments would be meaningless. Because somebody could say, sure, I'll buy the equity down the road. Coal prices then plunge. And at that point, the person says, oh, never mind. Actually, I'll just vote against the plan. And then there's no need to carry out the commitments. So the plan support agreements are not vote buying. They're simply enforcing the commitments that the bankruptcy court found were incredibly valuable to the estate. If you had a pure ---- Isn't that what the ---- To me, at the end of the day, that's what this case is all about. Is it a new value, legitimate financial transaction on which you assume a significant risk and you get paid for that risk? Or do you buy votes? And if you voted against the plan, you got less, which is a classic bad faith issue. Well, and on that question, I would direct you to numerous factual findings by the bankruptcy court, which at this point are reviewed only for clear error. The bankruptcy court found, quote, that consideration provided to the rights-offering backstop parties and the private placement parties in exchange for their participation in the private placement agreement and the rights-offering backstop commitment agreement is not treatment on account of such parties' claims, which is what the statute speaks of. To Judge Gross's question, that includes the discount on the equity was itself part of the compensation for the commitments. At Joint Appendix 999 to 1000, there's the Cowan Declaration, which was Peabody's expert. The bankruptcy court adopted the entirety of that declaration as factual findings at Joint Appendix 1333 and 2138 to 39. That declaration explains that this transaction as a whole was negotiated at arm's length and that all of the components of it provided great value to the estate and that the discount being provided was in exchange not for the claims, but for, again, the agreement to purchase the stock at a predetermined price, notwithstanding the volatility of coal prices, and for the substantial backstop. The plan support agreements at the back end were simply a way of enforcing that. If you had a situation where you had just a pure, naked giveaway in return for a vote, that might create a problem of vote solicitation under a different provision of the bankruptcy code, but that doesn't implicate Section 1123A.4, which only requires that the same treatment be provided for each claim. Here, Peabody's plan did provide the same treatment for each claim because there was the same distribution for each member of any given class without regard to the claim and without regard to the option to participate in the private placement. Do you think this case is materially different from the case that was a Judge Wilde, the 28-J letter with the transcript that was a very interesting transcript? Do you think this case is materially different? I do think it's materially different because in that case the debtors had looked for better terms and there was no evidence in the way that there was both evidence here and factual findings here that the private placement and backstop fees were necessary and proportionate for the risks involved. Again, and all of this is in the record and adopted by the bankruptcy court as findings, there was a limited window in which this deal could be negotiated because coal prices were so volatile and there was such a significant risk that coal prices would crater that the agreement to purchase stock at a predetermined price, notwithstanding that, provided tremendous value to the estate. And the bankruptcy court found that not only did it provide value to the estate, but it maximized the value for all creditors. That's in the district court at Addendum 17 and in the bankruptcy court record at Joint Appendix 2409. In the Pacific drilling, there was not the same consideration of alternatives. Here, both Peabody with its fiduciary duties to all creditors and the unsecured creditors committee, which you'll hear from separately carrying out its fiduciary duties, considered numerous alternatives and rejected them for reasons that are explained in the record. The alternatives had higher execution risk. They would have left Peabody post-emergence with an unreasonably high level of debt. There were numerous flaws in each of the alternatives that were proposed. Those are explained also in the record at Joint Appendix 1032-39 and Joint Appendix 1875-81. So the fundamental distinction with Pacific drilling consists of the lack of alternatives there. And that also is an important distinction with the LaSalle case on which Mr. LeBlanc relies. In LaSalle, first the Supreme Court was interpreting different statutory language. But even if that statutory language were to apply here, LaSalle involved a naked giveaway to old equity holders. They got the opportunity to purchase equity in the reorganized entity at no cost and with no consideration of alternatives. And here there was significant value provided to the estate, as I've discussed, and there was careful consideration of alternatives. With respect to the equitable mootness argument that Mr. LeBlanc raised, the remedies that they're seeking are not legally available. If the violation of the plan here was unequal treatment, then it perpetuates rather than remedies that violation to continue the unequal treatment by giving them the remedy that they're seeking. Likewise, if there were a good faith violation, which is contrary to the bankruptcy court's findings that this was an integral part of the plan that maximized value for the creditors, but if there were such a finding, then draining the estate further would only make the violation worse. It wouldn't remedy it. Mr. LeBlanc argues that there was consent to lesser treatment here. The reason that's not an answer is that the consent was to lesser treatment relative to those who provided these valuable commitments, the agreement to purchase the stock despite the volatility in coal prices and the backstop commitments. No one consented to be treated less favorably than the ad hoc committee coming in after the fact and essentially asking for all of the benefit of the discount with none of the risk. Well, I think that, in my mind, your arguments have bridged too far. You're saying if you assume that the plan is totally invalid and illegal, and you're saying, well, because even though it's an illegal plan with all kinds of illegal provisions in it and treated this particular creditor illegally, they have no remedy available to them, even money damages because you went out the next day and consummated the plan. I don't think that's what equitable mootness is all about. I mean, I think you can't use your bad conduct as a sword as well as a shield against their appeal. Well, the remedy for them in that situation would have been to pursue a stay. They sought a stay in the bankruptcy court and the district court. Well, the remedy is they're asking for money damages. You can pay them money damages. There's no reason you can't do that. Paying them money damages that are the equivalent of perpetuating the very wrongs that they're claiming would not remedy the wrongs. Those money damages would also go to the very concerns at the heart of the equitable mootness doctrine. They would, of course, upset the reliance interests of the creditors who have invested based on this plan by draining the reorganized entity of additional assets. So this unsettles the expectations that the equitable mootness doctrine is concerned with. They sought a stay from the district court. The district court alerted this court to the possibility that they might seek to stay confirmation of the plan. And they never pursued that. It's in those stay hearings that those arguments should be fleshed out. And if there appears to be a violation, then you can hit pause on the plan at that point and address them. But what they can't do is fail to seek a stay in this court and now come back afterwards and essentially try to undermine the plan either through money damages or by seeking to have the entire plan unwound as a whole. Thank you, Your Honors. Thank you, Counsel. Ms. Hughes. Thank you. May it please the Court. Lena Hughes of Morrison & Forrester on behalf of the Official Committee of Unsecured Creditors. Under the Bankruptcy Code, the Creditors Committee is a fiduciary appointed to represent the interests of all unsecured creditors. We agree with Peabody that the plan complied with all code provisions. But rather than repeat those arguments, I would like to focus on the role that the Creditors Committee played in the process and explain first how it reached its conclusion that the debtors' plan maximized value for unsecured creditors and second, why it decided not to support the alternative proposals of the Ad Hoc Committee. On that first point, after the debtors filed their initial plan and related transaction documents in December 2016, the Creditors Committee and its advisors carefully examined them. It then negotiated with the debtors to improve recoveries for unsecured creditors, including by establishing a $75 million cash pool that would appeal to retail-level unsecured creditors. But even after the Creditors Committee decided to support the debtors' plan, it did so with a fiduciary out to consider the Ad Hoc Committee's alternative proposals. And it compared those proposals to the debtors' plan. It used them to negotiate still further improvements to unsecured creditor recoveries under the debtors' plan. But it ultimately concluded that the debtors' plan was still the best option to maximize value for unsecured creditors. And the result of this was a very successful bankruptcy, especially from the perspective of unsecured creditors. If I can just step back, the debtors managed to raise $1.5 billion of equity, which was an unprecedented feat in recent coal bankruptcies. And unlike recent prior coal bankruptcies where unsecured creditors received pennies on the dollar, unsecured creditors here received substantial recoveries. To name just a few of those, general unsecured creditors of certain of the debtors could choose to receive a 22% recovery through shares in the debtor and participation in the rights offering. Or they could choose to opt into a $75 million cash pool and receive recoveries up to 50%. Unsecured claims for less than $200,000, which are known as convenience claims, received recoveries of up to 72.5%. Now, the ad hoc committee claims that its alternative proposals show that better terms were available to the debtor. But the creditors' committee disagreed for several reasons. First, unlike the debtors' plan, many of the ad hoc committee's alternative proposals lacked committed exit financing. Without that, the debtors may not have been able to pay off their first level of creditors, and so would have been prevented from providing meaningful recoveries to any other creditors. In addition, many of the alternatives anticipated the debtors emerging from bankruptcy with a higher level of funded indebtedness than they could responsibly bear. And even when the ad hoc committee belatedly provided proposals that would have kept the debtors within a sustainable level of debt, it was then just too little too late. The marginal improvements in recoveries were offset by serious execution risk. Given the volatility of coal prices, the months-long delay that would have necessarily followed from switching plans at that point could have eliminated entirely the ability of unsecured creditors to obtain meaningful recoveries. And the creditors' committee, as the fiduciary for all unsecured creditors, took that into account and determined that the debtors' plan and not the ad hoc committee's alternative proposals represented the best option to maximize value to unsecured creditors. If there are no questions, we ask this Court to affirm the decisions of the Bankruptcy Court and District Court. Thank you. Thank you, Counsel. Mr. LeBlanc, take two minutes. I used up your last bit of time with no questions, so take a couple of minutes. Thank you, Your Honor. I certainly appreciate that. And I would like to respond to some of the arguments that were made. Let me start with equitable mootness, and I didn't address, Judge Shepard, your question with respect to timing, and I think it's important. We got a decision from the District Court on the stay that we sought, denying our stay on the 30th of March. That was a Thursday. We knew, because the debtors had announced it, that they were closing on Monday, going effective on their plan on Monday. And so we made a practical decision that coming to this Court in that period of time wasn't a practical outcome. That's why we didn't seek a stay. I didn't want the Court to be left without any response to that. But on the equitable mootness point, the suggestion that paying us cash or giving us the opportunity to invest cash into this debtor on the same terms that they did would somehow treat people inconsistent with their expectations is flatly wrong. Every person who agreed to the plan, who was not a proponent of the plan, was not one of those noteholders who were in those mediations, agreed that the noteholder co-proponents could authorize the issuance of additional preferred equity on any terms. So everyone else, and the noteholder co-proponents are parties to this appeal. Those people who are not parties to this appeal, those that are the subject of the equitable mootness concerns, they consented in advance to the noteholder co-proponents authorizing the issuance of preferred equity. So that's not an issue. Now, with respect to the merits of the argument, what I think Your Honors heard was a lot of this case is exceptional, this is unique, this is the only coal company that provided meaningful distributions. That doesn't matter. Compliance with the Bankruptcy Code is still required. That's what the Supreme Court just said in Jevic. Moreover, I would urge the Court to look at the Supreme Court's statement in LaSalle with respect to the argument that this is just one part of a global transaction and you need to allow this part to go through because when you consider it in the whole, it's a value-maximizing transaction. The Supreme Court rejected that idea as well, saying it's no answer to say it's one part of a global transaction. I wanted to correct one statement. I referred the Court to JA 1791 earlier. It's actually 1719, which is where the Bankruptcy Court orders the commitment fees to be approved as the price of getting capital. With that, Your Honor, unless the Court has any other questions, I would urge the Court to reverse the Bankruptcy Court's decision and the District Court's decision and remand this to the Bankruptcy Court for determination of an appropriate remedy. Thank you, Your Honors. Thank you very much. Counsel, thank you for your arguments. The case is submitted.